UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMONTE REID, #756082,

        Petitioner,

                               CASE NO. 15-CV-14116
v.                               HON. GEORGE CARAM STEEH

STEVE RIVARD,

        Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

## I.   Introduction

This is a habeas case brought pursuant to 28 U.S.C. § 2254.

Michigan prisoner Amonte Reid ("petitioner") was convicted of armed

robbery, MICH. COMP. LAWS § 750.529, felon in possession of a firearm,

MICH. COMP. LAWS § 750.224f, and two counts of possession of a firearm

during the commission of a felony, MICH. COMP. LAWS § 750.227b, following

a jury trial in the Oakland County Circuit Court in 2012.  He was sentenced,

as a third habitual offender, MICH. COMP. LAWS § 769.11, to 25 to 80 years

imprisonment on the armed robbery conviction, a concurrent term of four to 10 years imprisonment on the felon in possession conviction, and concurrent terms of two years imprisonment on the felony firearm convictions to be served consecutively to the other sentences. In his pleadings, he raises claims concerning the effectiveness of trial counsel and the sufficiency of the evidence. For the reasons set forth, the Court denies the petition for a writ of habeas corpus. The Court also denies a certificate of appealability and denies leave to proceed in forma pauperis on appeal.

## II.   Facts and Procedural History

The petitioner's convictions arise from his armed robbery of Matthew Fugate during a drug deal at Fugate's home in Pontiac, Michigan on December 30, 2011. The Court adopts the summary of the trial testimony as set forth in the prosecutor's brief on direct appeal to the extent that it is consistent with the record. Those facts are as follows:

> Matthew Fugate testified that he lived at 842 Emerson in the City of Pontiac. (TI, 241) Matthew's brother, Robin Fugate, and Brittany [Sanchez], Robin's girlfriend, lived with defendant. On December 30, 2011, Matthew, Robin, Brittany, and a friend named Hector [Sanchez] were at the house on Emerson. At approximately 2:00 p.m., Matthew received a text from "Jack Frost Boy." Matthew did not know his real name at the time, but knew him through an individual named Sam Sullivan. (TI,

239-244) Sullivan's street name was Jack Frost. Matthew tried to get pills from Sullivan, but Sullivan referred Matthew to Jack Frost Boy. Matthew identified defendant in court as the person he knew as Jack Frost Boy. (TI, 245-246)

Matthew explained that he had back problems and used Vicodin. He had bought Vicodin from Jack Frost Boy four or five times. Matthew stated that he had also sold Vicodin, Somas, marijuana and Xanax in the past. (TI, 247-248) Matthew texted defendant on December 30, 2011, that he would buy Vicodin from defendant. (TI, 249-252) The parties stipulated to admission of the text messages as People's exhibit (1). (TI, 250) Matthew never had any problems with the previous transactions with defendant. (TI, 256)

Defendant arrived at Matthew's home in the afternoon. Matthew heard a knock at the door and told defendant to come in. Matthew asked Robin, Brittany, and Hector to leave the room and they left. (TI, 256-257) Defendant entered the room while patting himself down and said he did not have the Vicodin with him and that he left them in the car. Defendant went back outside, came back in, and was still patting himself down. Defendant told Matthew he only had thirty Vicodin. Matthew told defendant he would take whatever he had. (TI, 268)

Matthew pulled out his wallet and his phone to calculate the cost of the thirty pills. When Matthew opened up his wallet containing four hundred dollars, defendant said,"[G]ive it all to me." Matthew looked up and saw a silver gun pointed at him. Matthew thought he was going to die and tried to defend himself. Matthew grabbed defendant's arm with both hands and tried to knock the gun out of his hand. Matthew then hit defendant in the left jaw with his right hand, but defendant was able to turn his arm and shoot Matthew in the stomach. (TI, 268-273) Matthew indicated that he still had a scar in the middle of his stomach from the bullet wound. (TI, 269) After being shot, Matthew fell to the ground. Matthew's leg was hurting. Matthew saw his brother come running around the

corner and then he heard a second shot. That was all Matthew remembered because he blacked out. (TI, 273-274) Matthew stated that he did not pull the trigger on the gun. Matthew's wallet was taken. (TI, 274)

Matthew went to Pontiac Osteopathic Hospital for medical care. As a result of the gunshot wound, Matthew got a hernia. Matthew's leg still hurts now and it was hard for him to walk up and down stairs. (TI, 276-277) While Matthew was in the hospital, a detective showed him a photo lineup of six different photos. Matthew identified photo number three as the person who shot him. Matthew circled photo number three and signed his name. The photo lineup was admitted as People's exhibit (11). (TI, 277-280) Matthew also showed the detective his phone and the text messages he had received. (TI, 280)

On cross-examination, Matthew stated that he did not tell the detective prior to the preliminary examination in March of 2012 that he was a drug dealer. (TI, 283) Matthew received a text message at 1:30 p.m. on December 30, 2011, from someone named EJ asking if he had some Somas. Matthew explained that Somas were muscle spasm pills. (TI, 285) Matthew texted Leroy, another "associate," asking him if he had Somas and telling him he would "grab" 86 of them from him. (TI, 286-287) Then Jack Frost Boy texted Matthew that he had 165 Vicodin pills and Matthew told him he would take 100 pills and another 65 pills later. (TI, 287-288) Matthew had not seen Hector since the day of the incident. (TI, 295-296) Matthew may have had marijuana in his system at the hospital. (TI, 298)

Raymond Wiggins, a deputy with the Oakland County Sheriff's Department, testified that on December 30, 2011, at approximately 4:24 p.m. he was dispatched to 842 Emerson in Pontiac regarding a shooting victim. (TII, 12-14) Wiggins arrived at the home and entered through the front door. Matthew Fugate was lying on the living room floor with a gunshot wound to the stomach. (TII, 16) There was also a female subject present, as well as Robin Fugate, the brother of Matthew. (TII,

18-19) Matthew appeared to be coming in and out of consciousness. Emergency medical technicians arrived and attended to Matthew's injuries. (TII, 20)

Wiggins observed one spent shell casing at the front door and another spent casing at the north end side of the house. Wiggins was advised that there were two dogs in the house and one had been shot. (TI, 22)

Brittany Sanchez testified that on December 30, 2011, she lived at 842 Emerson in Pontiac with Matthew and Robin Fugate. (TII, 26-27) Brittany was dating Robin. At approximately 4:00 p.m. on December 30, Brittany was at home with Matthew, Robin, and Hector Sanchez. (TII, 28) Hector was a friend of the Fugate brothers. (TII, 29) Brittany heard someone knock at the door and Robin told Matthew to answer the door. (TII, 29) Brittany was in the kitchen with Robin when she heard two pops. (TII, 30) Brittany ran to the back door because she was pregnant and did not want to get hurt. (TII, 30-31) Robin ran towards Matthew. (TI, 31) Brittany went to check to see if everybody was okay. Robin was on the phone to the police and Matthew was on the floor in front of the bathroom. Brittany indicated that she did not see any blood, but Matthew was hurt and could not move his right leg. (TII, 32) Robin was applying pressure to the wound. (TII, 33) Their Pit Bull puppy, Boots, was shot. (TI, 34)

On cross-examination, Brittany stated that she never saw the person that entered the house. According to Brittany, Robin and Hector were not present when Matthew had a discussion with the person that entered the house. (TII, 36)

Robin Fugate testified that he lived at 842 Emerson in Pontiac with his brother, Matthew Fugate, and his girlfriend, Brittany Sanchez. (TII, 45-46) At approximately 4:15, a person knocked at their door and Robin identified defendant in court as that person. (TII, 50-51) Matthew let defendant in. (TII, 51) Robin knew that Matthew had bought Vicodin pills from defendant a

couple of times. (TII, 52) Robin stated that he was in the room while Matthew and defendant discussed some things.

Defendant left the house, went out to his car, and then walked back in patting himself down. (TII, 53) Robin left the room and went to the kitchen. While in the kitchen, Robin heard a gunshot and a thud. Robin walked towards the living room and heard a re-rack sound. Robin peeked his head around the corner and it looked like defendant was going to shoot at him, but then he turned ninety degrees and shot at the dog. (TII, 54-55) As defendant was leaving, Robin observed a gun, a wallet, and phone in defendant's hands. (TII, 55) Hector was in the living room, right next to Matthew. (TII, 56)

Robin called the police. He pulled up Matthew's shirt and observed a big hole on the left side of his stomach. Matthew was not able to move. (TII, 57) The police and emergency medical technicians arrived quickly. The police took Robin, Brittany, and Hector to the police station. (TII, 58) The police interviewed Robin and asked him to look at two photo lineups. Robin did not see defendant in the first lineup, but he did identify defendant in the second line up as the person who shot. The photo lineup was admitted as People's exhibit (12). (TII, 58-61)

On cross-examination, Robin stated that he knew Matthew was dealing in something, he just did not know what. (TII, 63) Hector was a good friend to Matthew and Robin. Matthew did not sell drugs to Hector. (TII, 64) Robin wrote out a statement to the police. Robin did not actually see defendant shoot Matthew. (TII, 67) The next day, Robin spoke with a detective. Robin denied telling the detective that he answered the door. (TII, 73) Robin stated that Hector was not in the kitchen at the time the shooting occurred, but that he was in the living room. (TII, 77-78)

Claudio Lopez, a deputy with the Oakland County Sheriff's Department, testified that on December 30, 2011, he was

dispatched to 842 Emerson in Pontiac regarding a shooting that occurred at the residence. (TII, 85-86) When he arrived at the location, emergency medical services were already there and treating the victim. (TII, 85-86) The victim was lying on the floor in the living room. Lopez observed a hole in the victim's stomach and there was blood.(TII, 86-87) There was a Pit Bull dog in the bathroom with an injury to his ribcage and his foot. There was a blood trail in the living room, hallway, and bathroom. (TII, 87-88)

Rachel Grace, a firearm and tool mark examiner and crime scene investigator for the Oakland County Sheriff's Department, was qualified as an expert in the field of firearms identification. (TII, 95) On December 30, 2011, Grace went to 842 Emerson in Pontiac to process a shooting scene. (TI, 96) Grace took photographs of everything that she observed. She marked where the evidence should be, drew a sketch, and collected the evidence. (TI, 97) Grace observed and collected a fired bullet, two fired cartridge cases, and some suspected blood. (TI, 98, 108) The fired cartridges were 380 caliber Remington Peters. (TII, 110) Grace received a  bullet from Pontiac Osteopathic Hospital that was taken from the victim. (TII, 112) It was determined that the two fired cartridges were fired from the same firearm. (TII, 114)

On cross-examination, Grace explained that she was not able to indicate the manufacturer of the weapon. It could have been an automatic or semi-automatic weapon. (TII, 118-119) The shells could have been fired by a .380 or a 9mm weapon. (TII, 119) Grace did not do any testing of the blood to determine if it was human blood. (TII, 120)

John MacDonald, a detective with the Oakland County Sheriff's Office, testified that he went to the scene at 842 Emerson in Pontiac on December 30, 2011. MacDonald was met by Deputy Lopez. When he entered the home, MacDonald observed a shell casing next to the door and a lot of blood next to the hallway on the living room floor. (TII, 127-129) MacDonald

observed another fired cartridge case in the living rom. (TII, 130) MacDonald spoke with Matthew at Pontiac Osteopathic Hospital. Matthew was laying on his back, he had a mask for breathing, and he was in a lot of pain. (TII, 131) MacDonald had a brief conversation with Matthew and took custody of Matthew's cell phone. Matthew showed MacDonald that he had done a calculation on his cell phone of 30 Vicodin at 2.50 a piece. (TII, 131-132)

Matthew told MacDonald that he met defendant through Sam Sullivan. MacDonald spoke with Sullivan at the Pontiac police substation. (TII, 133-134) MacDonald showed photo lineups to Sullivan, Matthew, and Robin. (TII, 134-136) MacDonald interviewed defendant on January 4, 2012. MacDonald identified defendant in court as the person he interviewed. (TII, 136) Defendant signed the Miranda waiver form. (TII, 139) The video of defendant's interview was admitted as People's exhibit (31) and the transcript of the video was admitted as People's exhibit (32). (TII, 141) The video of defendant's interview was played for the jury. (TII, 147)

MacDonald stated that defendant told him he had no involvement in the incident at 842 Emerson. Defendant denied going to that location or selling pills. (TIII, 5-6) MacDonald gave defendant numerous opportunities to explain what happened. MacDonald brought up the issue of self-defense and defendant did not say anything about that. (TIII, 7)

MacDonald spoke with defendant again on January 5, 2012. That interview was not recorded. Defendant was advised again of his rights. Defendant told MacDonald that he was actually at the address and that Sullivan contacted him to do a drug transaction for him. Defendant was picked up by his girlfriend, Carla Versolli, and they went to Sullivan's home. Defendant was given the pills and he went to 842 Emerson. The sale was supposed to be ninety Vicodin for two-hundred and fifty dollars. Sullivan gave defendant a phone number and address. (TIII, 8-10)

Defendant told MacDonald that Matthew Fugate said he could only pay for thirty pills and defendant started counting out the thirty pills when Matthew pulled a gun on him. (TIII, 10) Matthew told defendant, "[D]on't move." Defendant stated that he grabbed the gun and pushed up and they both fell backwards onto the couch. Defendant told MacDonald that he was able to "spin" the gun so the barrel was not pointing at him, and it went off. Defendant thought he might have been shot, but he checked his clothing and realized he was not shot. (TIII, 11-13) Defendant told MacDonald that he was running out of the door when Robin fired a round at him. (TIII, 13) Defendant told MacDonald that he changed his phone number so he could not be tracked. (TIII, 14) MacDonald was unable to locate Versolli for trial. (TIII, 15-16)

On cross-examination, MacDonald stated that he did get a written statement from Versolli. Versolli had no information about what happened in the house and she did not tell MacDonald that defendant had a gun. (TIII, 16-17) MacDonald stated that no one ever told him that three shots were fired. (TIII, 25) Robin told MacDonald that he was the person that answered the door and told Matthew that his "peoples" were there. (TIII, 31) Robin told MacDonald that he was in the room until Matthew was about to pay. (TIII, 32) Robin never told MacDonald that as defendant ran, he turned around and shot the dog. (TIII, 33) No one ever told MacDonald that Hector was sitting in the living room during the transaction. (TIII, 38)

The parties stipulated that (1) defendant was convicted of a felony and the requirements for regaining eligibility were not met, (2) defendant's cell phone number on December 30, 2011, was 313-974-1217 and defendant changed his number on December 31, 2011, to 313-784-3983, and (3) defendant's interview was edited to contain only the portions that were relevant to this case, and were admitted as People's exhibits (33), (34), and (35). (TIII, 43)

The People rested. (TIII, 44)

Defendant chose not to testify. (TIII, 49) The defense rested.
(TIII, 59)

Pros. App. Brf., pp. 1-9 (footnotes omitted).

Following his convictions and sentencing, the petitioner pursued an appeal of right with the Michigan Court of Appeals raising the claims presented on habeas review.  The court denied relief on those claims and affirmed his convictions.  People v. Reid, No. 312792, 2014 WL 688643 (Mich. Ct. App. Feb. 20, 2014) (unpublished).  The petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order.  People v. Reid, 497 Mich. 854, 852 N.W.2d 620 (2014).

The petitioner then filed his federal habeas petition.  He raises the following claims:

I.      Trial counsel was ineffective for failing to present the defense of temporary innocent possession of a firearm and for failing to request a jury instruction on unarmed robbery.

II.     The prosecution presented insufficient evidence to support his armed robbery conviction.

The respondent has filed an answer to the petition contending that it should be denied.

## III.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), codified at 28 U.S.C. § 2241 et seq., sets forth the standard of

review that federal courts must use when considering habeas petitions

brought by prisoners challenging their state court convictions.  The AEDPA

provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim--
>
> > (1)    resulted in a decision that was contrary to, or
> > involved an unreasonable application of, clearly
> > established Federal law, as determined by the Supreme
> > Court of the United States; or
> >
> > (2)    resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the
> > evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' ... clearly established law if it

'applies a rule that contradicts the governing law set forth in [Supreme

Court cases]' or if it 'confronts a set of facts that are materially

indistinguishable from a decision of [the Supreme] Court and nevertheless

arrives at a result different from [that] precedent.'"  Mitchell v. Esparza, 540

U.S. 12, 15-16 (2003) (per curiam) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)); <u>see also</u> <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003) (quoting <u>Williams</u>, 529 U.S. at 413); <u>see also</u> <u>Bell</u>, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" <u>Wiggins</u>, 539 U.S. at 520-21 (citations omitted); <u>see also</u> <u>Williams</u>, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) (quoting <u>Lindh</u>, 521 U.S. at 333, n. 7); <u>Woodford v. Viscotti</u>, 537 U.S. 19, 24 (2002) (per curiam)).

A state court's determination that a claim lacks merit "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).  Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  Id.  Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id; see also White v. Woodall, _ U.S. _, 134 S. Ct. 1697, 1702 (2014).  Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."  Woods v. Donald, _ U.S. _, 135 S. Ct. 1372, 1376 (2015).  A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state

court decision to be reasonable. <u>Woods v. Etherton</u>, _ U.S. _, 136 S. Ct. 1149, 1152 (2016).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. <u>Williams</u>, 529 U.S. at 412; <u>see also</u> <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120, 125-26 (2008) (per curiam)); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" <u>Harrington</u>, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require <u>awareness</u> of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002); <u>see also</u> <u>Mitchell</u>, 540 U.S. at 16. The requirements of clearly established law are to

be determined solely by Supreme Court precedent.  Thus, "circuit precedent does not constitute 'clearly established Federal law as determined by the Supreme Court'" and it cannot provide the basis for federal habeas relief.  Parker v. Matthews, 567 U.S. 37, 48-49 (2012) (per curiam); see also Lopez v. Smith, _ U.S. _ 135 S. Ct. 1, 2 (2014) (per curiam).  The decisions of lower federal courts, however, may be useful in assessing the reasonableness of the state court's resolution of an issue.  Stewart v. Erwin, 503 F.3d 488, 493 (6th Cir. 2007) (citing Williams v. Bowersox, 340 F.3d 667, 671 (8th Cir. 2003)); Dickens v. Jones, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review.  See 28 U.S.C. § 2254(e)(1).  A habeas petitioner may rebut this presumption only with clear and convincing evidence.  Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).  Moreover, habeas review is "limited to the record that was before the state court."  Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

## IV.  Analysis

### A.  Ineffective Assistance of Trial Counsel Claims

The petitioner first asserts that he is entitled to habeas relief because

trial counsel was ineffective for failing to raise the defense of temporary innocent possession of a firearm and for failing to request a jury instruction on unarmed robbery.  The respondent contends that these claims lack merit.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of trial counsel.  To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  As to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance.  Id. at 690.  There is a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  Id. at 690.  The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.  The reviewing court's scrutiny of counsel's performance is highly deferential.  Id. at 689.  To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." Id. at 694.

A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. Id. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Id. at 686.

The Supreme Court has confirmed that a federal court's consideration of an ineffective assistance of counsel claim arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Harrington, 562 U.S. at 105 (internal and end citations omitted). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. Rather, the question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard. Id.

The petitioner first asserts that counsel was ineffective for failing to

raise the defense of temporary innocent possession of a firearm. Citing the

Strickland standard, the Michigan Court of Appeals denied relief on this

claim essentially ruling that the petitioner could not show that trial counsel

was ineffective because the defense was inapplicable to his case. The

court explained in relevant part:

> Under MCL 750.224f(1), a "person convicted of a felony shall
> not possess, use, transport, sell, purchase, ship, receive,
> or distribute a firearm in this state" unless certain conditions are
> met. In People v. Dupree, 284 Mich App 89; 771 NW2d 470
> (2009) (Opinion by M.J. Kelly, J.), aff'd in part and remanded,
> 486 Mich 693; 788 NW2d 399 (2010), this Court addressed the
> question whether traditional common-law defenses might apply
> to the crime of felon in possession of a firearm. Id. at 101–102.
> This Court concluded that "the defenses of duress and
> self-defense are still applicable to a charge of being a
> felon-in-possession." Id. at 104. "[A] defendant who is otherwise
> prohibited from possessing a firearm will only be justified in
> temporarily possessing a firearm if the possession is
> immediately necessary to protect the defendant or another from
> death or serious physical harm." Id. at 106. Further, to be
> justified in temporarily possessing a firearm, the defendant
> must not have "recklessly or negligently place[d] himself or
> herself in a situation where he or she would be forced to
> engage in criminal conduct." Id. at 108.
>
> Our Supreme Court affirmed this Court's result, holding that the
> defendant must introduce "sufficient evidence from which the
> jury could [conclude] that he violated the felon-in-possession
> statute but that his violation could be justified because he
> honestly and reasonably believed that his life was in imminent
> danger and that it was necessary for him to exercise force to
> protect himself." Dupree, 486 Mich at 697.

In this case, defendant told Detective MacDonald that he went to the victim's house to sell drugs to the victim. The victim's testimony was that defendant came to his house to sell Vicodin. After entering the home, defendant said he had left the pills in his car. When he returned, according to the victim, defendant pointed a gun at him and said to give him all of the money in his wallet. Thus, the evidence established that defendant placed himself in a position to engage in criminal conduct and was not justified in temporarily possessing the firearm. Accordingly, defense counsel cannot be deemed ineffective for failing to raise the defense of temporary innocent possession of a firearm to the charge of felon in possession of a firearm. <u>Armstrong</u>, 490 Mich at 289–290.

<u>Reid</u>, 2014 WL 688643 at *1-2.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The petitioner fails to establish that trial counsel erred and/or that he was prejudiced by counsel's conduct. As discussed by the Michigan Court of Appeals, the defense of temporary innocent possession was inapplicable under state law given the victim's testimony and the petitioner's admissions about participating in a drug transaction. It is well-settled that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005); <u>see also</u> <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691 (1975) (state courts are the final arbiters of state

law); <u>Sanford v. Yukins</u>, 288 F.3d 855, 860 (6th Cir. 2002). Consequently, the petitioner cannot establish that trial counsel erred or that he was prejudiced by counsel's conduct. Defense counsel cannot be deemed ineffective for failing to make a futile or meritless argument. <u>See</u> <u>Coley v. Bagley</u>, 706 F.3d 741, 752 (6th Cir. 2014) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."); <u>United States v. Steverson</u>, 230 F.3d 221, 225 (6th Cir. 2000). Moreover, given the victim's testimony that the petitioner pulled the gun during the incident, as well as the petitioner's own admissions about engaging in a drug transaction, trial counsel may have reasonably concluded that raising temporary innocent possession of a firearm as a defense to the charges was inappropriate. Given the trial testimony, such a defense also lacked merit. The petitioner fails to establish that trial counsel was ineffective under the <u>Strickland</u> standard. Habeas relief is not warranted on this claim.

The petitioner next asserts that trial counsel was ineffective for failing to request a jury instruction on unarmed robbery. Citing the <u>Strickland</u> standard, the Michigan Court of Appeals denied relief on this claim ruling that trial counsel was not ineffective because an unarmed robbery instruction was not warranted based upon the evidence presented at trial.

The court explained:

> "Unarmed robbery is clearly a necessarily included lesser offense of armed robbery." People v. Reese, 466 Mich 440, 446–447; 647 NW2d 498 (2002). The "instruction is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and it is supported by a rational view of the evidence." Id. at 446.
>
> The elements of armed robbery, MCL 750.529, are: (1) the defendant was engaged in the course of committing a larceny of any money or other property, (2) the defendant used force or violence against a person who was present or assaulted or put the person in fear, and (3) the defendant, in the course of committing the larceny, possessed a real or feigned dangerous weapon or represented that he or she possessed a dangerous weapon. People v. Chambers, 277 Mich App 1, 7; 742 NW2d 610 (2007). The elements of unarmed robbery, MCL 750.530, are: (1) the felonious taking of the property of another, (2) by force or violence or assault or putting in fear, when (3) the defendant is unarmed. People v. Harverson, 291 Mich App 171, 177; 804 NW2d 757 (2010). The element distinguishing unarmed robbery from the offense of armed robbery is the use of a weapon or an article used as a weapon. Reese, 466 Mich at 501.
>
> Defendant told Detective MacDonald that "he was able to get both hands on the gun and spin it and the gun went off." Then, according to defendant's version, defendant dropped the gun and the victim's brother came into the room, picked up the gun, and fired a round at defendant as he was leaving the house. We hold that a rational view of the evidence did not support an unarmed robbery jury instruction. The jury would have to find that the victim pulled a gun on defendant in order to commit armed robbery of the pills, but that defendant was able to grab the gun with both hands and turn it around facing the victim, whereupon the gun went off and fell to the floor. Then, the jury

would have to find that, after the victim was shot, defendant used force or violence or assault or put the victim in fear, without the use of a weapon, in order to steal the victim's wallet and cell phone. However, the victim was already shot and on the floor unable to move when defendant picked up the wallet and cell phone from the floor, and defendant could have simply reached down and picked the items up before leaving the residence. We hold that, because a rational view of the evidence could not support an unarmed robbery jury instruction, defense counsel was not ineffective for failing to request the jury instruction. Furthermore, the failure to request the instruction may have been deliberate trial strategy to force the jury into an "all or nothing" verdict. People v. Rone (On Second Remand), 109 Mich App 702, 718; 311 NW2d 835 (1981). Defendant has failed to demonstrate that defense counsel's performance was objectively unreasonable or that he was prejudiced by defense counsel's defective performance. Armstrong, 490 Mich at 289–290.

Reid, 2014 WL 688643 at *2.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The petitioner fails to establish that trial counsel erred and/or that he was prejudiced by counsel's conduct in this regard. The Michigan Court of Appeals determined that the unarmed robbery instruction was inappropriate as a matter of state law. As discussed supra, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review." Bradshaw, 546 U.S. at 76; see also Mullaney, 421 U.S. at 691; Sanford,

288 F.3d at 860.  The petitioner thus cannot establish that counsel erred or that he was prejudiced by trial counsel's conduct.  Defense counsel cannot be deemed ineffective for failing to make a futile or meritless argument. Coley, 706 F.3d at 752; Steverson, 230 F.3d at 225; see also Goodwin v. Johnson, 632 Fl3d 301, 317 (6th Cir. 2011) (counsel cannot be ineffective for failing to seek a jury instruction on a lesser offense that it not warranted by the evidence).  Moreover, trial counsel may have decided to pursue an all-or-nothing strategy in the hope that the jury would acquit the petitioner of armed robbery.  Such a strategy was reasonable.  The fact that it was ultimately unsuccessful does not mean that counsel was ineffective.  Moss v. Hofbauer, 286 F.3d 851, 859 (6th Cir. 2002).  The petitioner fails to establish that trial counsel was ineffective under the Strickland standard. Habeas relief is not warranted on this claim.

### B.  Insufficient Evidence Claim

The petitioner also asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his armed robbery conviction.  The respondent contends that this claim lacks merit.

The federal due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he is charged."  In re Winship,

397 U.S. 358, 364 (1970).  The question on a sufficiency of the evidence

claim is "whether, after viewing the evidence in the light most favorable to

the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt."  Jackson v. Virginia,

443 U.S. 307, 319 (1979).  The Jackson standard must be applied "with

explicit reference to the substantive elements of the criminal offense as

defined by state law."  Brown v. Palmer, 441 F.3d 347, 351 (6th Cir. 2006)

(quoting Jackson, 443 U.S. at 324 n. 16).

A federal habeas court views this standard through the framework of

28 U.S.C. § 2254(d).  Martin v. Mitchell, 280 F.3d 594, 617 (6th Cir. 2002).

Thus, under the AEDPA, challenges to the sufficiency of the evidence

"must survive two layers of deference to groups who might view facts

differently" than a reviewing court on habeas review – the factfinder at trial

and the state court on appellate review – as long as those determinations

are reasonable.  Brown v. Konteh, 567 F.3d 191, 205 (6th Cir. 2009).  "[I]t

is the responsibility of the jury – not the court – to decide what conclusions

should be drawn from the evidence admitted at trial."  Cavazos v. Smith,

565 U.S. 1, 2 (2011) (per curiam).  "A reviewing court does not re-weigh

the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003) (citing Marshall v. Lonberger, 459 U.S. 422, 434 (1983)). Accordingly, the "mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." Id. at 788-89.

Under Michigan law, the elements of armed robbery are: (1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute. See MICH. COMP. LAWS § 750.529; People v Smith, 478 Mich. 292, 319, 733 N.W.2d 351 (2007); People v. Rodgers, 248 Mich. App. 702, 707, 645 N.W.2d 294 (2001); see also People v. Chambers, 277 Mich. App. 1, 7, 742 N.W.2d 610 (2007) (indicating that the assault component means that the defendant used force or violence against any person who was present or assaulted or put the person in fear). Identity is an element of every offense. People v. Yost, 278 Mich. App. 341, 356, 749 N.W.2d 753 (2008). Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, People v. Nowack, 462 Mich. 392, 399-400, 614 N.W.2d 78, 81 (2000); People v. Jolly, 442 Mich. 458, 466, 502 N.W.2d 177, 180

(1993), including identity, <u>People v. Kern</u>, 6 Mich. App. 406, 409-10, 149

N.W.2d 216 (1967), and intent or state of mind.  <u>People v. Dumas</u>, 454

Mich. 390, 398, 563 N.W.2d 31 (1997).

Applying the <u>Jackson</u> standard, the Michigan Court of Appeals

denied relief on this claim.  The court explained in relevant part:

> Viewed in a light most favorable to the people, a reasonable
> juror could find that defendant was guilty of armed robbery
> beyond a reasonable doubt. Defendant argues that nowhere in
> his testimony did the victim ever state that he was fearful or
> afraid of defendant at any time. Thus, the evidence was not
> sufficient to support the armed robbery verdict. This argument
> is without merit. At trial the prosecutor asked the victim what he
> was thinking when he saw the gun. The victim responded: "I
> was thinking, wow, I'm about to die, you know, like I'm just
> defending myself. I didn't really think nothing. I'm try to, just do
> what any other person would do, defend yourself." The trial
> court instructed the jury, in pertinent part, that to prove armed
> robbery the prosecutor must show that "the defendant used
> force or violence against, and/or put in fear [the victim]."
>
> Here, the use of "and/or" in the jury instruction is the source of
> defendant's challenge. If the language of a statute is
> unambiguous, it is presumed that the Legislature intended the
> meaning plainly expressed, and judicial construction of the
> statute is not permitted. <u>People v. Cole</u>, 491 Mich 324, 325,
> 330; 817 NW2d 497 (2012). When interpreting the common
> ordinary meaning of a word or phrase, use of a dictionary is
> appropriate. <u>People v. Laidler</u>, 491 Mich 339, 347; 817 NW2d
> 517 (2012).
>
> The word "and" is defined in pertinent part in The American
> Heritage Dictionary of the English Language, Third Edition
> (1992), as: "Together with or along with; in addition to; as well

as." The word "or" is defined in pertinent part as: "Used to indicate an alternative, usually only before the last term of a series." Considering these definitions, the statutory phrase "the defendant used force or violence against, assaulted, and/or put in fear (emphasis added)," would be better understood as, "the defendant used force or violence against, or assaulted, or put in fear, or all of the above." We conclude that "and/or," while it may not be the preferred way to state alternatives, is not ambiguous, and its meaning is understood by the general public and the Legislature intended "the meaning plainly expressed."

The phrase "put in fear" is one alternative in a list. Therefore, it is not necessary that the prosecutor prove that defendant put the victim in fear as long as the prosecutor presented sufficient evidence that defendant used force or violence against the victim, or assaulted the victim. Nevertheless, the evidence, viewed in a light most favorable to the prosecutor, was sufficient to show that defendant used violence against the victim and assaulted the victim and placed the victim in fear. "Because it is difficult to prove an actor's state of mind, only minimal circumstantial evidence is required." People v. McGhee, 268 Mich App 600, 623; 709 NW2d 595 (2005). The fact that defendant pointed a gun at the victim and demanded his money was "minimal circumstantial evidence" that the victim was placed in fear. Id. Viewed in a light most favorable to the people, we hold that a reasonable juror would find defendant guilty of armed robbery beyond a reasonable doubt.

Defendant additionally contends that because the jury acquitted him of assault with intent to commit murder and the lesser included offense of assault with intent to do great bodily harm, it could not find sufficient evidence to satisfy the first element of armed robbery, which requires an assault. We disagree. Assault with intent to commit murder and assault with intent to commit great bodily harm less than murder are specific intent crimes and require the prosecutor to show that the defendant had the specific intent to murder or to inflict serious injury of an

aggravated nature. <u>People v. Marshall</u>, 493 Mich 1020; 829 NW2d 876 (2013); <u>People v. Brown</u>, 267 Mich App 141, 147; 703 NW2d 230 (2005). Armed robbery is a specific intent crime and requires the prosecutor to show that the defendant had the specific intent to permanently deprive the victim of property. <u>People v. Lee</u>, 243 Mich App 163, 167–168; 622 NW2d 71 (2000); <u>People v. Parker</u>, 230 Mich App 337, 344; 584 NW2d 336 (1998). The verdict rendered by the jury reflects that it believed defendant had the specific intent to rob the victim but not to commit great bodily harm or murder. Thus, acquitting defendant of the assault offenses did not negate the jury conviction of armed robbery.

<u>Reid</u>, 2014 WL 688643 at *3-4.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of Supreme Court precedent or the facts. The prosecution presented sufficient evidence to establish the petitioner's guilt of armed robbery through the testimony of the victim and the other witnesses, as well as reasonable inferences from that testimony. To be sure, a victim's testimony alone can be constitutionally sufficient to sustain a conviction. <u>See</u> <u>Tucker v. Palmer</u>, 541 F.3d 652, 658 (6th Cir. 2008) (citing cases). In particular, the victim testified that the petitioner pulled a gun on him during their drug transaction and demanded all of his money, that he thought he was going to die, that he struggled with the petitioner, that the petitioner shot him, and that the petitioner took his wallet. Such testimony was sufficient to support the petitioner's armed

robbery conviction. The fact that the jury acquitted the petitioner of assault with intent to commit murder (and/or assault with intent to commit great bodily harm) indicates that the jury did not find sufficient evidence of the intent to commit murder or serious bodily injury; it does not mean that there was insufficient evidence of the assault necessary to support a conviction under the armed robbery statute.

The petitioner contests the Michigan Court of Appeals' interpretation of the armed robbery statute under state law. Such a claim is not cognizable upon habeas review. As discussed supra, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review." Bradshaw, 546 U.S. at 76; Sanford, 288 F.3d at 860. State courts are the final arbiters of state law and federal courts will not intervene in such matters. Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Oviedo v. Jago, 809 F.2d 326, 328 (6th Cir. 1987). Habeas relief does not lie for perceived errors of state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

The petitioner also seems to challenge the credibility of the witnesses and the inferences the jury drew from the testimony presented at trial. However, it is the job of the fact-finder at trial, not a federal habeas court, to

resolve evidentiary conflicts.  <u>Jackson</u>, 443 U.S. at 326; <u>Martin v. Mitchell</u>, 280 F.3d 594, 618 (6th Cir. 2002); <u>Walker v. Engle</u>, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").  The jury's verdict, and the Michigan Court of Appeals' decision affirming that verdict, were reasonable.  The evidence presented at trial, viewed in a light favorable to the prosecution, established beyond a reasonable doubt that the petitioner committed an armed robbery.  Habeas relief is not warranted on this claim.

## V.    <u>Conclusion</u>

For the reasons stated, the Court concludes that the petitioner is not entitled to federal habeas relief on his claims.  Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before the petitioner may appeal this decision, a certificate of appealability must issue.  <u>See</u> 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b).  A certificate of appealability may issue "only if the applicant has

made a substantial showing of the denial of a constitutional right." 28

U.S.C. § 2253(c)(2). When a court relief on the merits, the substantial

showing threshold is met if the petitioner demonstrates that reasonable

jurists would find the court's assessment of the claim debatable or wrong.

Slack v. McDaniel, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this

standard by demonstrating that . . . jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further."

Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). Having conducted the

requisite review, the Court concludes that the petitioner fails to make a

substantial showing of the denial of a constitutional right as to his claims.

Accordingly, the Court **DENIES** a certificate of appealability. The Court

also **DENIES** leave to proceed in forma pauperis on appeal as an appeal

cannot be taken in good faith. See FED. R. APP. P. 24(a). This case is

closed.

     **IT IS SO ORDERED**.

Dated: June 20, 2017

                              s/George Caram Steeh
                              GEORGE CARAM STEEH
                              UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 20, 2017, by electronic and/or ordinary mail and also on
Amonte Reid #756082, St. Louis Correctional Facility,
8585 N. Croswell Road, St. Louis, MI 48880.


s/Barbara Radke
Deputy Clerk